UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:17-cv-00561-RJC-DCK

| LAFAYETTE LIFE INSURANCE COMPANY, | ) |   |
|---|---|---|
| Plaintiff, | ) |   |
| v. | ) | ORDER |
| MARTHA COLE, Individually and as A Personal Representative of the Estate of Thomas L. Cole | ) |   |
| Defendant. | ) |   |

**THIS MATTER** comes before the Court on Plaintiff's Motion for Judgment on the Pleadings, (Doc. No. 9); its memorandum in support, (Doc. No. 10); Defendant's response in opposition, (Doc. No. 11); and Plaintiff's reply, (Doc. No. 12).

I. BACKGROUND

A. Procedural Background

Lafayette Life Insurance Company ("Plaintiff" or "Lafayette") filed its Complaint for a declaratory judgment on September 20, 2017. (Doc. No. 1). Martha Cole ("Defendant"), proceeding individually and as a personal representative of the estate of her deceased husband, Thomas L. Cole ("Mr. Cole" or "Insured"), filed an Answer and Counterclaim on November 14, 2017. (Doc. No. 5). Plaintiff filed its Motion for Judgment on the Pleadings, (Doc. No. 9) and memorandum in support,

1

(Doc. No. 10), on January 4, 2018. Defendant filed a memorandum in opposition to Plaintiff's Motion for Judgment on the Pleadings on January 18, 2018. (Doc. No. 11). Plaintiff filed a reply to Defendant's response on January 25, 2018. (Doc. No. 12). This matter is now ripe for adjudication, and the Court now turns to Plaintiff's pending Motion for Judgment on the Pleadings, (Doc. No. 9).

B. Factual Background

On September 28, 2006, Plaintiff issued a life insurance policy, number A 0891679 ("Policy") to Thomas L. Cole, Defendant's now deceased husband. (Ex. 1-A). In the Policy, Mr. Cole—the insured and owner of the Policy—named Defendant as his beneficiary. (Doc. No. 1, Ex. 1-A). In 2017, Mr. Cole chose to terminate the Policy by filing a 1035 exchange request, requesting that the Policy be liquidated and the funds go to a separate and independent entity, Brighthouse Financial ("Brighthouse") to fund an annuity. (Doc. No. 5 ¶ 7; Doc. No. 1, Ex. 1-B, at 1, 3, 6). A 1035 exchange request allows a policyholder to transfer funds from a life insurance policy, endowment, or annuity to a policy of a similar type. See 26 U.S.C. § 1035. The benefit of filing a 1035 exchange request is that it allows the policyholder to transfer the funds without recognizing any gain or loss. Id. § 1035(a); (See also Doc. No. 1-1, Ex. 1-B, at 3 ("Section 1035 of the Internal Revenue Code permits certain nontaxable exchanges of insurance and annuity policies.")). When performing a 1035 exchange, a policyholder is not allowed to take direct possession of the funds. A policyholder can terminate his policy and receive the net cash value, but the funds must be transferred from one insurer to another.

2

On June 30, 2017, Mr. Cole signed a 1035 exchange request in which he agreed to "absolutely assign and transfer" his "right, title and interest" in the Policy to Brighthouse. (Doc. No. 1-1, Ex. 1-B at 3). He requested that "this transfer be accomplished as quickly as possible." (Id.). On July 6, 2017, Brighthouse signed the same exchange request form and mailed the form to Lafayette, requesting that Lafayette complete the Section 1035 exchange and send Brighthouse a check for the value of the Policy to fund an annuity. (Id. at 6). Later that day on July 6, 2017, FedEx picked up the completed and signed 1035 exchange request from Brighthouse at 4:57 P.M. (Doc. No. 1-1, Ex. 1-D). The next day—July 7, 2016—Mr. Cole died. (Doc. No. 1-1, Ex. 1-F). That same day, FedEx delivered the 1035 exchange request to Lafayette. (Doc. No. 1-1, Ex. 1-E).

After learning of Mr. Cole's death, Mr. Cole's financial advisor, Devrin Avant, contacted Brighthouse to request that the 1035 exchange be stopped, and Brighthouse complied with this request. (Doc. No. 5-2). On July 7, 2017 at 12:59 P.M., a claims examiner from Lafayette Life emailed Mr. Avant and notified him that, per his request, the Policy "is now being set up as a death claim and to disregard the transfer." (Doc. No. 5-1). She additionally advised him that "once this is set up it will change the policy status from active to death-pending so the transfer could not happen." (Id.). At 2:14 P.M., Brighthouse acknowledged Mr. Avant's request and confirmed by email that it had "contacted Lafayette Insurance Company to cancel the transfer request for Thomas Cole." (Doc. No. 5-2). However, upon receipt of the 1035 exchange request, Lafayette Life processed the 1035

3

exchange, signed a check, payable to Brighthouse, for the Policy's net value, $240,084.86, plus interest on September 18, 2017, and mailed the check to Brighthouse. (Ex. 1-G).

The above material facts are undisputed, and the only currently disputed issues are questions of law. At issue now, Plaintiff contends that the Policy terminated prior to Mr. Cole's death, alleging that the effective date of termination was the date the request was signed, not the date Plaintiff received the request form. (Doc. No. 1 ¶ 20). However, Defendant alleges that the Policy had not terminated and that therefore, she is entitled to death benefits under the Policy. (Doc. No. 5 ¶ 20). On September 20, 2017, Plaintiff filed this action seeking a declaratory judgment declaring that (a) the effective date of the Policy's assignment was June 30, 2017; (b) the effective date of the Policy's termination was July 6, 2017; and (c) Plaintiff is not liable to Defendant for the Policy's death benefits because the Policy terminated prior to the death of the insured. (Doc. No. 1 ¶ 21). In response, Defendant filed a Counterclaim and sued for (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; and (3) bad faith. (Doc. No. 5 at 6–9). Defendant seeks that (1) the Court enter a judgment declaring that, because Mr. Cole neither assigned nor terminated the Policy, Plaintiff owes full death benefits under the Policy to Defendant; and (2) the Court enter a judgment against Plaintiff awarding her damages, including punitive damages, and other further relief as the Court deems just and proper for the causes of action stated in her Counterclaim. (Doc. No. 5 at 9–10).

## II. STANDARD OF REVIEW

Rule 12(c) motions are governed by the same standard as motions brought under Rule 12(b)(6).  Occupy Columbia v. Haley, 738 F.3d 107, 115 (4th Cir. 2013).  In contrast to a Rule 12(b)(6) motion, the court may consider the answer as well on a motion brought pursuant to Rule 12(c).  Alexander v. City of Greensboro, 801 F. Supp. 2d 429, 433 (M.D.N.C. 2011).  In a Rule 12(c) motion, the court may consider the complaint, answer, and any materials attached to those pleadings or motions for judgment on the pleadings "so long as they are integral to the complaint and authentic."  Philips v. Pitt Cty. Mem. Hosp., 572 F.3d 176, 180 (4th Cir. 2009); see also Fed R. Civ. P. 10(c) (stating that "an exhibit to a pleading is part of the pleading for all purposes.").  "In resolving a motion for judgment on the pleadings, the court must accept all of the non-movant's factual allegation as true and draw all reasonable inferences in its favor."  Marx Indus., Inc. v. Baseline Licensing Grp., LLC, No. 5:09-CV-136, 2010 WL 4790169, at *1 (W.D.N.C. 2010) (citing Bradley v. Ramsey, 329 F. Supp. 2d 617, 622 (W.D.N.C. 2004)).  Thus, the applicable test on a motion for judgment on the pleadings is whether, when viewed in the light most favorable to the party against whom the motion is made, genuine issues of material fact remain or whether the case can be decided as a matter of law.  Alexander, 801 F. Supp. 2d at 433.

III. DISCUSSION

A. The Insured Effectively Assigned His Rights in the Policy to Brighthouse and Terminated the Policy By Signing the 1035 Exchange Request.

As a threshold matter, North Carolina law governs this dispute. See Restatement (Second) of Conflict of Laws § 192 (1969) (noting that generally, in disputes regarding life insurance contracts, the law of the state where the insured was domiciled at the time he applied for the life insurance policy governs). Under North Carolina law, it is well settled that life insurance policies are construed as contracts, and their terms and provisions govern the rights and obligations arising between the insurer and the insured. Fidelity Bankers Life Ins. Co. v. Dortch, 348 S.E.2d 794, 796 (N.C. 1986) (citations omitted). Accordingly, we must turn to the language of the Policy to determine this dispute.

1. The Language of the Policy and the 1035 Exchange Request Are Clear and Unambiguous.

In North Carolina, the meaning of the language used in an insurance policy is a question of law for the Court to decide. Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co., 172 S.E.2d 518, 522 (N.C. 1970). When construing the terms of an insurance policy, a court must enforce the policy as written "without rewriting the contract or disregarding the express language used." Newton v. U.S. Fire Ins. Co., 391 S.E.2d 837, 839 (N.C. Ct. App. 1990). "[T]he intention of the parties controls any interpretation or construction of the contract, and intention must be derived from the language employed." Fidelity, 348 S.E.2d at 796. Thus, unless the

6

language of the contract is ambiguous, North Carolina adheres to rules of construction to honor the "fundamental right of freedom of contract." Id.

The dispositive issue in the case at hand is whether the insured terminated the Policy by signing the 1035 exchange request prior to his death. Thus, two documents govern this dispute: the Policy and the 1035 exchange request. The Court turns first to the language of the Policy.

a. The Assignment of the Policy

Defendant denies that the insured assigned the Policy or tried to transfer ownership to Brighthouse. (Doc. No. 5 ¶ 11, 15). Upon examining the clear language of Policy, and the 1035 exchange request as well as the undisputed facts of this case, the Court disagrees.

The Policy includes a Transfer of Ownership provision:

You may transfer the ownership of this policy at any time by written application acceptable to us. The transfer will be effective the date you sign our transfer of ownership form but will be subject to any good faith action taken by us before we receive the form. We may require that you return the policy to us for endorsement to show the transfer.

(Ex. 1-A). Thus, under the clear terms of the Policy, the insured had the right to choose to assign his policy to another person or entity, and he had the right to choose to terminate his policy at any time. Nevertheless, Defendant argues that the "Policy does not provide for assignment of rights to another person or entity" and asserts that a "transfer of ownership" is distinguishable from an assignment. (Doc. No. 11 at 3). The Court finds this distinction immaterial. An assignment, at its core, is the "transfer of rights or property." *Assignment*, Black's Law Dictionary (10th ed. 2014).

7

Thus, Defendant is incorrect in claiming that the Policy does not address the assignment of rights to another person or entity. Moreover, examining the language of the 1035 exchange request further undercuts Defendant's argument regarding the distinction between "assignment" and "transfer." In the 1035 exchange request, the insured specified

> I hereby absolutely *assign and transfer* all or, in the case of a partial exchange, the designated portion, of my right, title and interest in and to the above referenced contract to Brighthouse Financial, including, but not limited to, the right to surrender, assign, transfer, or change beneficiary. . . . It is my intention that this transfer qualify as a Section 1035 exchange and that no portion of this exchange be actually or constructively received by me. . . . I request that this transfer be accomplished as quickly as possible.

(Doc. No. 1-1, Ex. 1-B at 3) (emphasis added). The insured himself assented to a provision which seems to use the terms indistinguishably, promising to both assign and transfer his rights in the Policy to Brighthouse. Furthermore, this language is unambiguous and clearly manifests the insured's intent to "absolutely assign and transfer" his "right, title, and interest in" the Policy to Brighthouse. (Id.). Thus, Defendant's contention that the insured did not attempt to transfer ownership fails. The plain language the insured signed and assented to in the 1035 exchange request indicates that this is exactly what Defendant intended to do.

Nevertheless, Defendant also contends that the assignment was not effective because the insured used a 1035 exchange request that bore Brighthouse's logo to effectuate the assignment. (Doc. No. 11 at 4). Defendant points to the language of the Policy that specifies that "[t]he transfer will be effective the date you sign *our*

8

transfer of ownership form." (Doc. No. 1-1, Ex. 1-A at 8) (emphasis added). Defendant claims that this language means that the insured must have used a form that was generated or provided by Lafayette, not Brighthouse, to effectively transfer the insured's interests in the Policy. Defendant hones her focus on a single word in the transfer provision and ignores the first sentence and general character of the provision: "You may transfer the ownership of this policy at any time *by written application acceptable to us.*" (Id.) (emphasis added). The 1035 exchange request constituted a written application acceptable to Lafayette, as demonstrated by the fact that Lafayette complied with the insured's request by terminating the insured's account and mailing a check to Brighthouse. Therefore, according to the clear and unambiguous terms of the Policy, the insured's assignment and transfer of his rights was effective when he signed the 1035 request. At that moment, his rights in the Policy were extinguished and transferred to Brighthouse.

        b. The Termination of the Policy

In the 1035 exchange request, the insured also requested that Lafayette terminate his Policy: "I hereby direct [Lafayette] to <u>LIQUIDATE</u> and transfer funds from my current contract or account to Brighthouse Financial . . . ." Subsequently, Brighthouse accepted this assignment and requested that Lafayette terminate the Policy:

> Brighthouse Financial accepts the liquidation and assignment of the amounts referenced in Section 2 and has established a non-qualified annuity to receive the proceeds (and, for a 1035 exchange, the receiving contract shall have the same owner(s) and annuitant(s) as the [Policy]). Please send a check for the cash surrender value as indicated below. If

9

this transaction is intended to qualify as a tax-free exchange under IRC Section 1035, please (a) do not withhold any amounts for taxes, and (b) provide us with cost basis information by completing Section 2 above and returning a copy with the payment check. Please mail check to Brighthouse Financial as instructed below.

(Doc. No. 1-1, Ex. 1-B at 6). Defendant emphasizes a distinction between the use of the words "liquidate" and "terminate." Again, Defendant sees semantic distinctions where none exist.[1] Indeed, by Defendant's own admission, the insured intended to terminate the Policy prior to signing the 1035 exchange request. (Doc. No. 5 ¶ 7). Defendant also admits that "the *termination request* was sent to Lafayette . . . on July 6, 2017." (Doc. No. 5 ¶ 1) (emphasis added).

Because it is undisputed that Defendant admits the 1035 exchange request was a termination request, the Court looks to the terms of the Policy regarding termination. The Policy contained a provision regarding termination:

> If you request that we terminate this policy, we will pay you the net cash value, if any. . . . A written request, signed by you, in a form acceptable to us, will be required for termination of the policy. Any request for termination will be effective when you sign the request. Any request for termination will be subject to any payment or other action we may take before you receive the request.

(Doc. No. 1-1, Ex. 1-A). The Policy contained clear language that specified how to effectively terminate the policy and what happens upon the event of termination. Despite this clear language specifying that termination is effective upon the insured

---

[1] Black's Law Dictionary first defines liquidate as settling "(an obligation) by payment or other adjustment; to extinguish." *Liquidate*, <u>Black's Law Dictionary</u> (10th ed. 2014).

signing a termination request, Defendant contends that termination of the policy never occurred. (Doc. No. 5 ¶ 20). On the other hand, Plaintiff contends that "the Policy terminated by its own terms on July 6, 2017" when Brighthouse signed the 1035 exchange request. (Doc. No. 12 at 6). However, upon construing the language of the Policy and the 1035 exchange request together, the Court finds that the effective date of termination was actually June 30, 2017—the date that the insured signed the 1035 exchange request. On June 30, 2017, the insured directed Lafayette "to <u>LIDQUIDATE</u> and transfer funds" from the Policy to Brighthouse. (Doc. No. 1-1, Ex. 1-B, at 1–2). Thus, according to the language of the Policy, the termination became effective upon the insured signing the request on June 30, 2017, prior to the insured's death.

c. The Attempted Unsuccessful Revival of the Policy

Defendant argues that the Section 1035 transfer request was effectively cancelled on July 7, 2017. To support this contention, Defendant attaches email correspondence from a Lafayette claims examiner to the insured's financial advisor on July 7, 2017 indicating that the 1035 transfer would be stopped. (Doc. No. 5-1). This was sent in response to Brighthouse contacting Lafayette earlier that day and asking Lafayette to cancel the transfer request. (Doc. No. 5 ¶¶ 15–16). Defendant argues that "[b]ecause the 1035 exchange was stopped prior to its completion, the Policy remained in effect at Mr. Cole's death and, therefore, Lafayette Life owes the full death benefits under the Policy" to Defendant. (<u>Id.</u> ¶ 17). This contention is meritless.

As stated above, the Policy effectively terminated upon the insured signing the 1035 exchange request. Therefore, the contract terminated on June 30, 2017 and could not be modified. Moreover, the Policy could not be revived pursuant to the terms of the Policy: "If you have requested that we terminate this policy, it cannot be reinstated." (Ex. 1-A). Once again, the clear language of the Policy governs: neither the insured, nor Defendant, nor Brighthouse had the authority revive the Policy once the insured had signed the termination request. The rights of the parties were fixed at the time the insured signed the 1035 request.

B. Defendant's Counterclaims Fail as a Matter of Law.

Because the Policy terminated prior to the insured's death, Defendant's counterclaims must fail as a matter of law.

1. Breach of Contract

Defendant first alleges that Plaintiff breached the Policy by not paying death benefits to Defendant. (Doc. No. 5 ¶¶ 19–24). Under North Carolina law, "the elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." McKinnon v. CV Indus., Inc., 713 S.E.2d 495, 500 (2011) (quoting Poor v. Hill, 530 S.E.2d 838, 843 (2000)). To breach a contract, one must exist. Here, because the Policy was terminated prior to the death of the insured, and it could not be reinstated, no breach occurred, and Lafayette was not obligated to pay Defendant death benefits.

2. Breach of Implied Duty of Good Faith and Fair Dealing

Next, Defendant alleges that a duty of good faith and fair dealing was

implied in the Policy and that Lafayette breached this duty by continually refusing to pay death benefits under the Policy. (Doc. No. 5 ¶¶ 25–30). However, it is well established in North Carolina that "[a] defendant cannot breach a covenant of good faith and fair dealing when a claimant fails to establish the defendant breached the underlying contract." McDonald v. Bank of New York Mellon Tr. Co., Nat'l Ass'n, 816 S.E.2d 861, 864–65 (N.C. Ct. App. 2018) (citing Suntrust Bank v. Bryant/Sutphin Props., LLC, 732 S.E.2d 594, 603 (2012)). Accordingly, because Lafayette did not breach the Policy—the underlying contract—Defendant's claim for breach of implied duty of good faith and fair dealing must fail as a matter of law as well.

    3. Bad Faith

Finally, Defendant claims that Lafayette acted in bad faith by refusing to pay her death benefits. (Doc. No. 5 ¶¶ 31–41). Specifically, Defendant contends that Lafayette's "continued refusal to pay the death benefits claim and its reversal of position (from the July 7, 2017 email acknowledging the death claim to its subsequent filing of a declaratory judgment action in which Lafayette Life contends that Mr. Cole either assigned or terminated the Policy) constitutes aggravating and outrageous conduct for which punitive damages are appropriate." To recover punitive damages for an insurer's bad faith, a claimant must show "(1) a refusal to pay after recognition of a valid claim, (2) bad faith, and (3) aggravating or outrageous conduct." Lovell v. Nationwide Mut. Ins. Co., 424 S.E.2d 181, 184, aff'd, 435 S.E.2d 71 (1993) (citing Michael v. Metropolitan Life Ins. Co., 631 F.

Supp. 451, 455 (W.D.N.C.1986)). Aggravated and outrageous conduct "may be shown by fraud, malice, gross negligence, insult, rudeness, oppression, or wanton and reckless disregard of [another's] rights." Id. at 185 (citing Dailey v. Integon Gen. Ins. Corp., 331 S.E.2d 148, 154, disc. rev. denied, 336 S.E.2d 399 (1985)). North Carolina courts agree that bad faith "means 'not based on honest disagreement or innocent mistake.'" Lovell v. Nationwide Mut. Ins. Co., 424 S.E.2d 181, 185, aff'd, 435 S.E.2d 71 (1993) (quoting Dailey, 331 S.E.2d 148, 155). Therefore, judgment is proper in favor of the insurer when a coverage issue is reasonably in dispute. Topsail Reef Homeowners Ass'n v. Zurich Specialties London, Ltd., 11 Fed. Appx. 225, 237 (4th Cir. 2001) (unpublished) (citing Olive v. Great American Ins. Co., 333 S.E.2d 41 (1985)). When an insurer consistently denies "an insurance claim based on an interpretation that is neither strained nor fanciful, regardless of whether it is correct," the insurer has not committed the tort of bad faith. Olive, 333 S.E.2d at 46.

Here, as demonstrated, Lafayette's denial of payment of death benefits to Defendant was consistent with the unambiguous terms of the Policy and the insured's choice to convert the value of the life insurance policy into an annuity. The provisions of the Policy clearly specified that the Policy effectively terminated upon the insured signing a termination request. Therefore, Lafayette's interpretation of the Policy was not strained or fanciful, but rather, was accurate and reasonable. Lafayette's refusal to pay death benefits was proper and comported with the binding language of the Policy. Lafayette's actions are far from the

14

aggravated and outrageous conduct that the tort of bad faith contemplates. Thus, Defendant's bad faith claim must fail as well as a matter of law.

## IV. CONCLUSION

The chronology of events here boggles the mind and in some respects breaks the heart. But they do not alter the terms of the contract. Because no material issues of fact are in dispute, entry of judgment on the pleadings is proper.

**IT IS, THEREFORE, ORDERED** that

1. Plaintiff's Motion for Judgment on the Pleadings, (Doc. No. 9), is **GRANTED**. Specifically, the Court declares that
   a. The effective date of the insured's assignment of the Policy was June 30, 2017 when he signed the 1035 exchange request.
   b. The effective date of the Policy's termination was June 30, 2017 when the insured signed the 1035 exchange request.
   c. Lafayette is not liable to Defendant for the Policy's death benefit because the Policy terminated prior to the death of the insured.
2. Defendant's Counterclaim, (Doc. No. 5), is **DISMISSED**; and
3. The Clerk of Court is directed to close this case.

Signed: September 29, 2018

Robert J. Conrad, Jr.
United States District Judge